We'll proceed to the next case of the day, United States v. Ochoa-Lopez, Appeal No. 20-3063. And we have Mr. Morgan for the defendant and Ms. Bucci for the government. Thank you Judge Hamilton and may it please the court. This case is a story from our perspective about two phases of one investigation. On the one hand, it is a case about what by all accounts was a careful, thorough, eight-month-long investigation that uncovered key information investigators could then use to try and identify an unknown drug supplier. But it is also a case about investigators who set aside the fruits of that careful, eight-month-long investigation in favor of a series of assumptions made on the fly in order to justify charging ahead with their original plan. Mr. Morgan, before you go further into your argument, can I just clarify please that you are not challenging the validity of the traffic stop or the Terry stop in the first instance. Your challenge is to the automobile exception. That's correct. We're challenging probable cause for the search. The district court made findings that the officers who testified about the traffic infraction Just wanted to confirm you weren't challenging the other two at all. Correct. Correct. And so on the morning of October 27th, during their surveillance observations, investigators started to see some contradictions, things that didn't match with that careful investigation led them to believe would happen. Important facts. We've talked about several, and some I think are more peripheral, but two that I think are really core to their ability to try to identify this unidentified supplier, and that is where is the drug deal taking place, and would the supplier be arriving alone, or would he have anyone with him? And I want to talk about a couple of those assumptions that investigators had to make in order to justify moving ahead with that original plan. The first is that they had to assume that when the unidentified supplier told Trivari Lottie on an intercepted phone call that he was coming alone, and quote, I'm on my way right now, end quote. What he actually meant is that he planned to hang around Chicago a little bit longer and try to find a ride. Has anybody ever asked you, or told you, Mr. Morgan, I'm on my way, when they're really not quite out the door yet? I take your point. I absolutely take your point, Judge Hamilton, but here is why I think the government has a bit of a challenge sort of making that argument. This call began at approximately 8.53 a.m., and it went on for a minute or two, so we're Mr. Morgan also said, I'm leaving early. That's why I'm leaving early, so I can make it to you by 12. His scheduled departure time was 9 a.m. So we know maybe that meant he was in the house, you know, getting ready to walk out the door, but I think what we know is it didn't mean that he planned to sit around for even another five minutes, because he told Trivari Lottie, I'm leaving early, not at my 9 o'clock departure time. Mr. Morgan, you make some interesting points about, you know, unexpected facts, the way the events occurred wasn't exactly what the agents were expecting, but the passenger's injured leg and the lie about where they were coming from seem like pretty solid grounds to think that this, in fact, was the supplier who had just visited Lottie. I'll start with the leg, because I think that's the government's best fact. I think you're absolutely correct that that gives the government some modicum of suspicion about this car, but we don't think it's enough for probable cause for a few reasons. The first is that it still doesn't explain those key contradictions about the fact that there are two people in this car instead of one, and that this car was never even on the same side of town, as far as we know, as the location where the drug deal was supposed to take place. The other thing I would say is we do know that the injured leg put the passenger and the Corolla in a universe of individuals that we know the supplier was in, the folks on October 27th, 2017, who had some sort of leg injury. But I do think it's important that investigators knew something else, too. They knew that the supplier was in a narrower universe of individuals as well, and that is the universe of folks on October 27th who are on crutches. And so I think that detracts somewhat from the leg injury point as well. The other thing, excuse me, about the comment about transporting the car, I think that's I would point to, I believe it's Agent King's testimony, where he says we actually have no idea whether that was true or false. We don't know that that was a lie. They thought it was interesting that they didn't mention that they just stopped somewhere else as well, but the transport license plate seems to corroborate that in fact that was in fact true, that they were transporting the car, and the agents testified that they Mr. Morgan, is it significant to you that prior to the transaction in question, that Mr. Eladi was under surveillance pretty much during the entirety of, I don't know, call it what, 9, 10 o'clock forward? And so from the wiretap, it seems like the officers had very strong reason to believe a drug deal was going to go down. They had him under surveillance. I think you're right as far as I don't, I'm not really sure how to explain the change of location, and I think you're right to say we shouldn't speculate on it. It's a different location, and on the, in the ledger of good and bad facts for the defendant, you're right to point out that the change of location is a good fact here for you. But they had the deal under surveillance the whole entire time. That way. And is that significant in your view? I do, but perhaps for a different reason than you might expect. I think it's significant for a few reasons, because even if we assume their whole rationale to explain the location change as well, we have reason to believe that he would be personally involved in delivering the money to the supplier. But I think it's interesting, let's keep in mind what Tervari-Eladi did while he was being He went to known co-conspirator Tyshawn Watson's house. He backs into the driveway. Tyshawn comes out of the house, sits with him in the car, and while they're sitting there talking in the car, two unidentified silver vehicles pull up. And this is in the docket, in the district court docket at 84-3, and there's brief mention of this in the government's brief at pages 13 and 14. But Tyshawn comes out to the car, he's sitting with Tervari in the driveway, two unidentified vehicles arrive. The occupants of those vehicles go into Tyshawn's house. After the interaction and the car is over, Tyshawn returns to the house where those unidentified individuals went, and then Tervari leaves. So that's one interaction that we think a reasonable investigator might think he just watched the deal happen. I certainly don't know why there's more suspicion on the white Corolla than there was on that interaction. And then we know that after that, the thing that Tyshawn does during this one-hour window when the deal is supposed to take place, is he goes to the target address. He goes to the very place where the deal was supposed to happen during the very one-hour window when the deal was supposed to happen. And again, he backs into a driveway, an unidentified male comes out of the house, sits with him in the car for a brief while, returns to the house. We don't know who else might have been in the house, we don't know whether he was carrying anything with him. And then he does come back out and leave with Mr. Allotte. So I do think that those surveillance observations are important, but I'm not sure why those suggest any more suspicion for the white Corolla than all of those other interactions. Well, he took that test, I mean, he took what he, at least what I think law enforcement thought was a tester, right? He drove the tester with him. That's certainly the inference that they would like the court to draw. I think it raises the question why those unidentified individuals at Tyshawn Watson's house, for instance, might not have been assumed to be the tester. And certainly, given that both of those individuals appeared to arrive in separate cars, unlike the white Corolla, where you see two people and you're expecting one. If there are no other questions at this time, I'll reserve the balance for a moment. Thank you, Mr. Morgan. Thank you. Ms. Bucci. May it please the court, I'm Talia Bucci and I represent the United States in this appeal. I think the court is correct that the leg injury of the passenger in the Toyota Corolla is an incredibly good fact for the government. It is what took what could have been another type of transaction or could have been something else that the defense wants you to infer. It changes that from the realm of the universe that they're talking about and puts it squarely into probable cause. It's important to keep in mind the totality of the circumstances here and that probable cause does not require certainty, does not require proof beyond reasonable doubt. It requires a fair probability that evidence will be found in the search location. What should we make of the crutches versus walker? Is that just immaterial in the government's view? It is certainly a fact Your Honor can consider. It pales in comparison to the significance of the injury and the fact that this is a person who has a significant of enough injury, they need an assistive device. What type of assistive device, crutches or a walker, is less material, especially if you consider crutches may be used by a person if they're alone, whereas a walker needs to be taken out of a truck. So it could go with the fact that he has found a driver and now that driver can assist him in getting the walker out of the truck. It's important to keep in mind the totality of the circumstances, the fact that through the intercepted calls, agents knew that Tavari Lotti was planning to buy 500 grams of heroin from a supplier with leg injuries. It was going to occur in Rockford, Tavari Lotti was going to have someone with him for the transaction, it was going to occur around noon. That morning, surveillance observed Tavari Lotti, go to locations where he was known to pick up money, go to Tyshawn Watson who he was known to frequently pick up money from, go to the texted address, pick up an individual who they reasonably believed was the tester, take that individual with him. There is, of course, a change in location, however, as put in through the testimony of Special Agent King, agents knew that Tavari Lotti was using a form of communication, FaceTime, that they were not intercepting. They also knew from a transaction about three weeks earlier that he was using a type of non-intercepted communication with this specific supplier. So it was reasonable for them to infer that they had simply not been able to intercept the change in location. And it was reasonable for them to infer that Tavari Lotti was going to be doing this transaction himself. He ordered the heroin, he picked up the money, he had the tester, the someone with him, as he indicated in the calls. Based on the totality of the circumstances, including, as Judge Hamilton pointed out, the inconsistency with what the driver said they were doing with the vehicle, that officers didn't know exactly where the vehicle came from before it went to Lotti's, but saying that you're transporting a vehicle you just picked up is inconsistent with stopping at a known drug trafficker's house well off the expressway for 10 to 15 minutes. Ms. Pucci, I think I understand your points about the agent's testimony to the effect that deals don't always happen the way agents expect them to. You're not always plugged in to every communication. I guess, can you help us with how far that might go? Here you've got the injured leg. I wonder whether there would have been probable cause without that injury. Well, fortunately, we don't have to go down that avenue, but it's certainly a very significant fact. I mean, if you had, you have the other facts where you have the amount of time they stopped at the house, the time at which it occurred, but I agree with you that the leg is a significant fact. And I think it is one that certainly pushes us well into the area of probable cause. Yeah, I mean, I think the fairest reading of the record is they were surprised by the change of location. I mean, after the fact, they can certainly speculate for the reasons that you outlined in your brief that maybe there was some other channel of communication that wasn't being I agree, Your Honor, and that goes to Judge Hamilton's point about how they know that these things don't happen exactly how they're planned. Yeah, I don't know. I don't know if you were present for the number three case we were hearing this morning on the wrong address, or the made up address, rather, for a search warrant, which gets into a whole body of case law where the wrong houses, the wrong residences can be searched and torn apart, and even with no knocks and battering rams and so on. So those kinds of discrepancies certainly make me nervous at some point, so. And I understand. That's why I'm asking you, and I understand your point about this case, but I'm asking for any suggestions about how we might write about such a subject. I understand that concern, Your Honor. I think focusing on this case, it is important that the agents had Tavari Lotti under surveillance this entire time. They didn't lose him for an hour, a half hour, and then just randomly find him again at his house and see this car showed up. They had him under surveillance the whole time. They are trained, experienced narcotics investigators. They did not see anything else that, to them, was this drug transaction. This was the drug transaction in their belief, and that was confirmed by the injuries of the passenger. If there are no further questions, I ask that the Court affirm the District Court's decision. Thank you, Ms. Bucci. Mr. Morgan, rebuttal. Thank you, and I'll, just briefly, I'll come back to the point about drug deals not often happening exactly as expected. I think that's certainly true and certainly fair. Our suggestion, though, is this isn't a deal that just has some informational gaps. We've seen that in the case law that the government cites in their briefs, where it's easy to sit back and poke holes and find little informational gaps. We're talking about outright contradictions of probably the two best facts that they had to identify the supplier. How many people are going to be in the car when he shows up, and where on earth is he going to show up? And so this, of course, isn't, you know, the government is not here in the shoes of a qualified immunity plaintiff who has to come and find a case that's closely analogous or on all fours. But I think it's interesting that this may be, probable cause may be, the single most litigated issue in the entire American legal system. Certainly lately it is. Certainly today, right? State and criminal prosecutions in the Section 1983 context on the civil side, this may be the single most litigated issue in the entire legal system, and the government hasn't been able to find a single case where in the face of inconsistencies that are outright contradictions of core facts could take place, and the court still found probable cause. So we do think this is different from that body of case law about informational gaps or deals not happening quite as expected. It's a case about the best information they had being contradicted, and then the question becomes, obviously in the sort of the touchstone of the Fourth Amendment being reasonableness, what do we expect of a reasonable officer when that core information gets contradicted? And we mention it here, but of course, they didn't have to do this, right? At the point when they made the traffic stop, they knew who these two individuals were. They knew the supplier was returning the next day to deliver the second half of the shipment. So our position is that what a reasonable officer would do in that situation is slow down, reassess, continue investigating. Thank you. Okay. Thank you very much, Mr. Morgan. Our thanks to both counsel. Mr. Morgan, our thanks to you and your firm for taking on this assignment and the service that you provided to the court and to your client.